RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

      *v.*

JOEY CARR, JR.,

                *Defendant-Appellant.*

No. 10-6316

> Appeal from the United States District Court
> for the Western District of Tennessee at Jackson.
> No. 07-10022-001—James D. Todd, District Judge.

Argued: November 29, 2011

Decided and Filed: March 20, 2012

Before: MOORE and ROGERS, Circuit Judges; THAPAR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David W. Camp, LAW OFFICE OF DAVID CAMP, Jackson, Tennessee, for Appellant. Kevin G. Ritz, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** David W. Camp, LAW OFFICE OF DAVID CAMP, Jackson, Tennessee, for Appellant. Jerry R. Kitchen, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

    ROGERS, J., delivered the opinion of the court, in which THAPAR, D. J., joined. MOORE, J. (pp. 10–13), delivered a separate dissenting opinion.

---

[*] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

---

**OPINION**

---

ROGERS, Circuit Judge.  This is our second opportunity to consider the purported seizure of Defendant Joey Carr's car.  On the night of August 29, 2006, two police officers approached Carr's white Chevy Tahoe, which was parked in an otherwise empty coin-operated carwash.  After seeing furtive movements, and observing marijuana on Carr's dashboard, the police arrested Carr and searched the Tahoe.  They discovered a gun, crack cocaine, and marijuana.  Carr was charged with intent to distribute, 21 U.S.C. § 841(a), possession of a firearm, 18 U.S.C. § 924(c), and being a felon in possession of a firearm, 18 U.S.C. § 922(g).  Following a suppression hearing, the district court denied Carr's motion to suppress the fruits of the search.  Carr appealed and we remanded for further fact-finding.  On remand, the district court conducted a second evidentiary hearing and again denied Carr's motion to suppress.  This was proper because Carr and the officers had a consensual encounter and no seizure occurred when the officers parked their cruiser and approached Carr's vehicle.  Even if a seizure had occurred, the officers had reasonable suspicion sufficient to justify stopping Carr.

**I.**

On the night of August 29, 2006, three officers from the Madison County Metro Narcotics Unit—Lieutenant William Carneal and Investigators Marc Byrum and David Coffman[1]—were patrolling a high-crime area in which the Narcotics Unit had made several previous drug arrests.  While stopped at a traffic light in their unmarked black Ford Explorer, the officers noticed a white Chevy Tahoe parked in the wash bay of a coin-operated carwash.  The officers had information that the carwash was a meeting place where illegal narcotics were sold.  The Tahoe was the only car at the carwash and

---

[1]The district court spelled the officer's name "Coffman" while the government spelled his name "Kaufmann."  For the purposes of this opinion, the court adopts the district court's spelling.

the officers could not determine whether the Tahoe was occupied. No one was washing the vehicle.

When the light changed, the officers proceeded up the road, turned around, and returned to the carwash a few minutes later. The Tahoe had not moved from the carwash bay, and no one was washing it. The officers testified that they did not see any illegal activity, but were concerned that the car was abandoned or that an occupant was sick or injured. The officers drove into the carwash parking lot to approach the vehicle.

The officers parked their unmarked Explorer at an angle, approximately 12 feet from the front of the Tahoe's passenger's side. Carr, the driver of the Tahoe, could have driven forward past the Explorer or, alternatively, could have backed out of the open carwash bay. Officer Byrum testified that "there was enough room that [Carr] could have just merely steered around [the Explorer]," and that there was "ample room to steer and maneuver around our vehicle."

As the unmarked Ford Explorer came to a stop, the officers "momentarily activated the blue lights," which were "immediately turned off" in order "to inform the passenger of the vehicle that [they] were police and not someone trying to do him harm." Officers Carneal and Byrum exited the Explorer and approached the Tahoe on foot. Officer Carneal went to the Tahoe's passenger's side and Officer Byrum walked to the driver's side. Neither officer drew his weapon. As they approached, the officers saw Carr bending toward the middle console, fidgeting with his hands. When they arrived at the vehicle, Officer Carneal looked through the passenger-side window and saw a bag of marijuana sitting on the console of the Tahoe. Officer Byrum asked Carr to exit the Tahoe and undergo a safety patdown for weapons. Carr complied, but as he exited the vehicle, Officer Byrum noticed loose tobacco fall off Carr's clothing. The officers arrested Carr. Carr consented to a search of the vehicle, which uncovered marijuana, crack cocaine, plastic bags, scales, a large amount of money and a loaded handgun.

Carr was charged with intent to distribute, 21 U.S.C. § 841(a), possession of a firearm, 18 U.S.C. § 924(c), and being a felon in possession of a firearm, 18 U.S.C. § 922(g). Following a full evidentiary hearing, the district court denied Carr's motion

to suppress, finding that the encounter between Carr and police was consensual or, in the alternative, that the stop was supported by reasonable suspicion. Carr entered a conditional guilty plea and appealed the order denying his motion to suppress. We remanded for further fact-finding regarding the positioning of the police car and to determine the extent to which the blue police lights were used. *United States v. Carr*, 355 F. App'x 943, 946–47 (6th Cir. 2009). On remand, the district court again conducted a full evidentiary hearing, after which it issued an order denying Carr's motion to suppress for a second time. The district court found that Carr's encounter with the officers was consensual because the police car did not block Carr's exit from the carwash. Alternatively, the court found that the officers had reasonable suspicion to detain Carr because the encounter occurred in a high-crime area at night, the carwash was a known meeting place for drug dealers, and the car was in the bay of the carwash with no one washing it. Finally, the district court held that even if there was no reasonable suspicion to support the stop, suppressing the evidence would have no deterrent effect on improper police conduct. Carr filed this timely appeal.

## II.

### A.     Consensual Encounter

Carr's encounter with the officers occurred in three stages: the parking of the police vehicle, the officers' approach on foot, and Carr's exit from his vehicle. As a threshold matter, the stop was consensual at the point where the officers parked their unmarked police car near Carr's Tahoe. A "consensual encounter" occurs when "a reasonable person would feel free to terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 201 (2002). This court has analyzed similar civilian-police encounters by determining whether the police vehicle blocked the defendant's egress. *See, e.g., United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009); *United States v. Gross*, 662 F.3d 393, 399–400 (6th Cir. 2011). As the concurrence in *See* suggested, unless there is other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave. *See*, 574 F.3d at 315 (Gilman, J., concurring). Here, the police officers parked their unmarked, black Ford

Explorer at an angle in front of Carr's Tahoe.  The angle of the police vehicle gave Carr sufficient room to drive either forward or backward out of the carwash bay.  Although pulling forward would have required "some maneuvering" for Carr to get around the Explorer, "there was enough room that [Carr] could have just merely steered around [the Explorer]."  As one of the officers testified, Carr had "ample room to steer and maneuver around our vehicle."  Because the police vehicle allowed Carr to exit the carwash, albeit with "some maneuvering," Carr's car was not blocked for Fourth Amendment purposes.  To conclude otherwise would be an endorsement of a "simplistic, bright-line rule" that a detention occurs "any time the police approach a vehicle and park in a way that allows the driver to merely drive straight ahead in order to leave."

The officers' use of blue lights was not sufficiently coercive to transform this encounter into a compulsory stop.  An encounter does not become compulsory merely because a person identifies himself as a police officer.  *See O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011).  As the officers drove towards the bay, they activated the blue police lights once and immediately switched them off.  The officers testified that they did this to identify themselves as police officers. The objective facts support this testimony: the encounter occurred at night in the parking lot of an otherwise vacant business, and the Explorer was an unmarked police vehicle.  Given these facts, it would be reasonable for the officers to identify themselves as police officers by flashing the vehicle's blue lights once.

Carr's case is distinguishable from *See*, 574 F.3d at 313, and *Gross*, 662 F.3d at 399–400, because in both of those cases, the officer blocked any egress by parking directly in front of or behind the defendant's car.  In *See,* the court appears to have made this the sole basis for finding that a *Terry* stop occurred: "[g]iven the fact that [the officer] *blocked* See's car with his marked patrol car, a reasonable person in See's position would not have felt free to leave."  *See*, 574 F.3d at 313 (emphasis added).  Carr's case stands in contrast to both *See* and *Gross* because Carr was not blocked into the carwash bay, but rather could have left through either the front or the rear of the bay.

The encounter continued to be consensual as the officers approached Carr's Tahoe on foot. One officer approached the driver's door while another approached the passenger's door. We have held that approaching the vehicle in this manner, by itself, does not make the encounter non-consensual. In *United States v. Dingess*, 411 F. App'x 853, 855-56 (6th Cir. 2011), this court held that the following conduct constituted a consensual encounter:

> [Two officers] parked their cruiser on the street, leaving the driveway entrance clear. [Officer #1] approached the driver's door while [Officer #2] approached the passenger's door. According to the officers, both the driver's and the passenger's windows were down. As the officers approached the rear bumper, they smelled burning marijuana; as they moved closer, [Officer #1] observed Dingess holding a marijuana blunt in his right hand.

*Id.* at 854. The officers here similarly approached Carr's vehicle on both sides, which by itself does not compel a finding the encounter was not voluntary. Further, the officers did not engage in any coercive behavior that would make the encounter non-consensual. Examples of circumstances that might indicate seizure are "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Peters*, 194 F.3d 692, 697 (6th Cir.1999) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). None of this is present in Carr's case. To the contrary, the officers did not draw their weapons, and the officers testified that their entire conversation with Carr was polite and friendly in tone. The encounter remained consensual because no indicator of coercion was present.

Our sister circuits have found similar police encounters to be consensual. For example, the Tenth Circuit found a consensual encounter where the police car was parked at an angle near the defendant's car, but did not block defendant's car from leaving a parking lot. *United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). In that case, the officers approached the car without touching their weapons, and the conversation was polite and friendly in tone. *Id.* The court concluded the encounter was

consensual because the defendant's egress was not impeded and there was no coercive conduct by the officers.

When the officers asked Carr to exit the vehicle, the encounter transformed from voluntary to compulsory. "Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007). This seizure was constitutional because Carr's actions, coupled with the officer's observation of marijuana in the car, provided reasonable suspicion that Carr was engaging in illegal activity. *See United States v. Davis*, 430 F.3d 345, 355 (6th Cir. 2005). As the officers approached the car, they observed Carr's furtive movements as well as a bag of marijuana sitting inside the car. As Carr exited the vehicle, Officer Byrum noticed loose tobacco fall off Carr's clothing. The combination of Carr's furtive movements with the officers' identification of what appeared to be illegal contraband in the vehicle, provided reasonable suspicion sufficient to support the stop.

**B.     Reasonable Suspicion**

Even if Carr had been detained at the initial encounter, reasonable suspicion would have justified the detention. To determine the constitutionality of a brief investigatory stop, we examine the "totality of the circumstances" to determine whether a reasonable officer would have had a "particularized and objective basis" to suspect legal wrongdoing. *United States v. Brown*, 447 F. App'x 706, 711 (6th Cir. Jan 6, 2012). Here, there was a particularized and objective basis to believe that legal wrongdoing was occurring at the carwash. The area in question, Lane Avenue, was a high-crime area. Officers Carneal and Byrum each testified that a confidential informant had told them that the carwash was a meeting place for drug dealers. When driving through this high-crime area at night, past a known meeting place of drug dealers, the officers spotted a lone car in a carwash bay, that was not being washed. When they returned a few minutes later, they again observed the same car in the carwash bay and again noted that it was

not being washed.  Although the officers testified that they did not witness any illegality, objectively, the officers had reasonable suspicion to approach Carr's car.

It would be error for us to disregard the time of day and the fact that the area was a high-crime area when making the totality of the circumstances determination. Although the time of day and the fact that it was a high-crime area, standing alone, are insufficient to support reasonable suspicion, *see See*, 574 F.3d at 314, these factors inform this court's "totality of the circumstances" inquiry when considered in light of the facts of this case. *Id.* at 313 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). When viewed in this manner, as discussed above, the facts provided the officers with reasonable suspicion to approach Carr's Tahoe.

Further, this case is distinguishable from *See* and *Gross*, both of which happened in a residential parking lot in Ohio.  Parking a car in an otherwise vacant carwash that is a known meeting area for drug dealers, at night, and not washing that car, raises a different magnitude of suspicion than parking in a lot behind a residential building. Although it is possible that Carr was waiting for someone to return with change, as he claims, this was not reasonably likely—the carwash was set back from the road and the nearest business, a gas station, was closed.  If Carr had needed change, given the location of the carwash, he would have more likely gone to get change in the very car in which he sat.  This varies substantially from the events in *See*, where the defendant claimed he was parked in the parking lot of a residence to wait for a woman whom he wished to see.  *See*, 574 F.3d at 311 n.2.  It is at least plausible that the defendant in *See* was in the parking lot waiting for a woman, whereas it is not plausible that Carr was waiting for change.

Because this was a consensual encounter, or alternatively, a valid *Terry* stop, there is no need to address whether suppression is appropriate in light of the exclusionary rule's purpose.

**III.**

The district court's order denying Carr's motion to suppress is affirmed.

---------------

**DISSENT**

---------------

KAREN NELSON MOORE, Circuit Judge, dissenting.  The factual record developed by the district court on remand essentially affirmed that previously presented to this court for review.  Accordingly, the conclusion I previously expressed in concurrence remains unchanged:  The encounter between Carr and the police officers was neither consensual nor supported by reasonable suspicion and, consequently, was in violation of the Fourth Amendment. *See United States v. Carr*, 355 F. App'x 943, 949 (6th Cir. 2009) (unpublished opinion) (Moore, J., concurring).

## I.  CONSENSUAL ENCOUNTER

The law of this Circuit is clear that a *Terry* stop occurs when a police officer positions his or her vehicle to prevent an individual from physically leaving a citizen-police encounter. *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009); *United States v. Gross*, 662 F.3d 393, 399-400 (6th Cir. 2011).  The law is also clear that, absent other coercive actions, a *Terry* stop does not occur when a police officer positions his or her vehicle so as to preserve the individual's ability to leave the scene easily and without obstruction. *See*, *e.g.*, *United States v. Dingess*, 411 F. App'x 853, 856 (6th Cir. 2011) (unpublished opinion) (concluding encounter was consensual where officers parked on gravel on the side of the road "without blocking Dingess's egress").  However, the law has never endorsed a bright-line rule that so long as an individual can physically leave the site of a citizen-police encounter, the encounter remains consensual for Fourth Amendment purposes. *See United States v. Baldwin*, 114 F. App'x 675, 678 (6th Cir. 2004) (unpublished opinion) (concluding that where officers parked both in front of and behind defendants' vehicle, the defendants were seized even if it remained unclear whether they "could have exited the area even if they felt free to do so").  Instead, the standard is whether a reasonable person would feel free to leave under the totality of the circumstances. *See*, 574 F.3d at 313.

On remand, a second law-enforcement officer testified, and corroborated his partner's prior testimony, that the police vehicle was stopped approximately ten-to-twelve feet from Carr's vehicle, R. 102 (Evid. Hr'g Tr. at 20:20), that the police officers flashed their lights once to identify themselves, *id.* at 16:17-19, and that, while it was possible for Carr to leave the scene, he would have had "to steer and maneuver around [the police] vehicle" to exit forward or back up and reverse his vehicle to exit through the car wash's rear, *id.* at 21:1-3, 26:23-24. The officer also testified that maneuvering the car forward would have required steering toward a "rail" and a "ditch" located near the vehicles, both of which were large sport-utility vehicles. *Id.* at 26:4-15, 27:8-22.

While perhaps it was physically possible for Carr to leave the scene of the encounter, doing so would have been no simple feat given the various obstacles and maneuvering required. The police officers positioned their vehicle so as to obstruct Carr's forward-exit pathway, leaving him with only a clear rear exit, which would have required him to reverse the direction of his vehicle. Moreover, it was not as if the police officers were without other options for the positioning of their vehicle: They could have entered through the rear of the car wash and parked behind Carr's vehicle so that his forward-exit pathway was completely unobstructed, or they could have parked inside or in front of one of the adjacent bays. *See id.* at 29:1-30:7. The police officers, however, chose not to do so. Their choice is relevant because it gave nonverbal cues to Carr about his freedom to terminate the encounter. Specifically, the flashing of the lights combined with the aggressive positioning of the police vehicle signaled to Carr that a stop was occurring and that he was not free to terminate the encounter.[1] Consequently, at the moment the police officers parked their vehicle in front of Carr's vehicle a *Terry* stop occurred.

---

[1]Ironically, it is the majority's opinion that appears to endorse a bright-line rule—the establishment of which it criticizes—that, so long as a driver can physically leave the site of a citizen-police encounter, he has not been subject to a *Terry* stop.

## II.  REASONABLE SUSPICION

The question that follows is whether there was reasonable suspicion to justify the *Terry* stop.   No new facts regarding reasonable suspicion came to light during the evidentiary hearing on remand.  Thus, the issue is whether reasonable suspicion existed in light of the three facts previously identified by this court:  (1) that Carr's vehicle was parked at night at a car wash, but was not being washed (or at least not during the two-to-three minutes that the police officers observed the vehicle); (2) that the car wash was in a high-crime area; and (3) that the police officers previously received information that narcotics transactions had taken place at the car wash.  *Carr*, 355 F. App'x at 944.  Our precedent compels the conclusion that these facts do not support a finding of reasonable suspicion.  *Gross*, 662 F.3d at 400 (concluding that the "fact that Williams observed a vehicle parked in a public parking lot with the engine running and no driver behind the wheel in the early hours of the morning with a passenger 'slumped down' in the front passenger seat" did not alone support a finding of reasonable suspicion); *See*, 574 F.3d at 314 (finding a lack of reasonable suspicion where the police officer "was not responding to a complaint, he did not suspect the men of a specific crime, he had not seen the men sitting in the car for an extended period of time, he was not acting on a tip, he had not seen the men do anything suspicious, and the men did not try to flee upon seeing [the police officer] approach").

As the majority admits, we have held that the time of day and high-crime nature of the area are insufficient to support reasonable suspicion.  *See, e.g., See*, 574 F.3d at 314; *United States v. Blair*, 524 F.3d 740, 750-51 (6th Cir. 2008); *United States v. Caruthers*, 458 F.3d 459, 467-68 (6th Cir. 2006).  Although here a police officer testified that there was "information" that the car wash in question "was a meeting place" for narcotics transactions, the officer stated that they had never executed "any undercover drug buys" at this particular car wash.  R. 81 (Supp. Hr'g Tr. at 8:25-9:12).  Moreover, there was no testimony of any tips that a narcotics transaction would be occurring at the car wash at the time that they observed Carr's vehicle in the bay.  The fact that the police officers had a broad, general, and uncorroborated tip that narcotics transactions had

occurred at this car wash in the past did not provide reasonable suspicion that Carr was involved in such a transaction by virtue of his presence at the car wash. *Florida v. J.L.*, 529 U.S. 266, 271 (2000) (anonymous uncorroborated tips "lack[ing] the moderate indicia of reliability" and "provid[ing] no predictive information and therefore [no] means to test the informant's knowledge or credibility" are insufficient to establish reasonable suspicion); *cf. Caruthers*, 458 F.3d at 468 ("[A]n individual, whose general appearance and location matched the description given in the anonymous shot-fired call, fled and made furtive movements when approached by the police late at night in a high-crime area—provided reasonable suspicion to conduct a *Terry* stop."). In essence, this tip was no different than the instruction to the officer in *See* to pay attention to loiterers because of knowledge of increased robberies in the area. *See See*, 574 F.3d at 314.

Moreover, the lack of visible activity for two-to-three minutes, even in a nonresidential parking lot, was not sufficient to supply reasonable suspicion under *See* and *Gross*. Even the officers testified that when they approached the vehicle to investigate they did not have any particularized suspicions of criminal wrongdoing, but were more concerned about citizen welfare. R. 81 (Supp. Hr'g Tr. at 9:17-24, 16:21-17:21).[2] That the officers found Carr's presence at the car wash "odd" was simply not equivalent to reasonable suspicion to investigate. *Id.* at 9:20. Perhaps after a more lengthy observation of the car parked without any washing activity the police officers' hunches would have ripened into reasonable suspicion. However, the police officers chose not to allow for this possibility. In doing so, they acted in violation of the Fourth Amendment.

Accordingly, I respectfully dissent.

---

[2]This Circuit recently reaffirmed that a "community-caretaking function" is distinct from criminal investigation and cannot, standing alone, justify an investigative stop. *Gross*, 662 F.3d at 400-01 (distinguishing instance where officer conducted an investigative stop in the interest of community well-being where there was already an illegality justifying the stop).