NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0446n.06

No. 12-5844

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*May 02, 2013*

DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

UNDRA WILLIAMS,

       *Defendant-Appellant.*

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

**O P I N I O N**

BEFORE:    MARTIN, SUHRHEINRICH, and COLE, Circuit Judges.

COLE, Circuit Judge. Undra Williams moved to suppress the handgun eventually used to convict him of being a felon in possession of a firearm, claiming it was obtained as the result of an unlawful seizure by the police. The district court denied his motion after finding that the encounter in question was consensual. Although we agree with Williams that he was subject to an investigative detention requiring reasonable suspicion, we do not agree that it was unlawful. Accordingly, we affirm the denial of his motion to suppress on other grounds supported by the record.

I.

Sergeant Joseph Johnson of the Memphis Police Department ("MPD") was patrolling the parking lot of a nightclub in his squad car during the early morning hours of May 23, 2009, in response to a number of recently reported vehicle break-ins. He was joined by Officer Frank Amato, also of the MPD, who was driving his own squad car.

While on patrol, Sergeant Johnson spotted a vehicle backed into a parking space some distance from the nightclub's entrance—approximately one hundred yards—with its headlights on and the engine running. Two males, later identified as Walter Chalmers and Undra Williams, sat in the driver's seat and the front passenger's seat, respectively. Interest piqued, Sergeant Johnson approached perpendicular to the parked vehicle, which was hemmed in by a dumpster on one side, an unoccupied vehicle on the other, and a chain-link fence in the rear. He pulled his squad car just past the front of the parked vehicle before coming to a stop. We note here that the parties disagree whether Sergeant Johnson left enough room for Chalmers to maneuver out of the space. As the government tells it, and the district court found, the two vehicles formed an L-shape with a possible egress. As Williams tells it, the vehicles formed a T-shape that blocked the parked vehicle. The parties agree, however, that Sergeant Johnson kept his alley lights—the squad car's top-mounted searchlights used for sideways illumination—shining in the direction of the parked vehicle as he exited his own. He then walked around the back of his squad car, in front of the parked vehicle, and eventually to the driver's side door with his flashlight drawn.

Sergeant Johnson at this point noticed both occupants "shuffling around" and apparently "moving stuff" on the front floorboard. He also noticed that both appeared "unkempt" in contrast to average club patrons. Once at the driver's side door, Sergeant Johnson asked Chalmers what the two men were doing and simultaneously used his flashlight to probe the vehicle's interior. He immediately caught sight of DVD monitors and stereo equipment—wires exposed and boxes nowhere to be seen—at Williams's feet. The encounter escalated from there. Subsequent questioning revealed that Chalmers had a suspended driver's license, expired plates taken from

another vehicle, and a number of common automobile "burglary tools"—gloves, a flashlight, and a screwdriver—in plain view near his seat.

Sergeant Johnson then called for back-up. Officer Amato arrived and Chalmers and Williams were removed from the parked vehicle and detained in separate squad cars while the officers searched the lot for evidence of fresh break-ins. Once Officer Amato returned, he observed Williams "making a large amount of movement in the back seat" of his squad car. Officer Amato opened the door to discover a handgun lying on the floorboard beneath Williams. A search of his person followed and turned up several rounds of ammunition.

A federal grand jury indicted Williams for being a convicted felon in possession of a firearm, 18 U.S.C. § 922(g), and later added a count for willfully failing to appear after he skipped a court date and fled the district for six months, 18 U.S.C. § 3146(a)(1). Williams filed a motion to suppress the handgun and associated contraband, arguing that the officers initially seized him without "sufficient probable cause, or reasonable, articulable and individualized suspicion" in violation of the Fourth Amendment. The district court denied his motion after concluding that the encounter in question was consensual based on the government's version of the events. Williams then pleaded guilty to both counts but reserved the right to appeal the denial of his motion to suppress. The district court sentenced him to 76 months in prison and 3 years of supervised release.

II.

This appeal raises two Fourth Amendment questions. First, was the initial encounter between Sergeant Johnson and the occupants of the parked vehicle consensual and therefore not a seizure?

Second, assuming it was a seizure, did Sergeant Johnson have a reasonable, articulable suspicion of criminal activity at the time to justify it?

A.

Williams contends that the encounter was not consensual from the outset. We review de novo the district court's legal conclusion to the contrary de novo. *United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008). We review for clear error the district court's factual finding that the government's version of the events was more credible than Williams's version, and we construe all factual inferences in the government's favor. *Id.* at 536-37.

The Fourth Amendment protects "the right of the people" to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with this language, we have described three categories of police-citizen encounters that impose increasingly stringent standards: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which . . . must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)). The encounter here concerns the line between the first two categories. That line is crossed—in other words, a consensual encounter becomes a seizure—when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (footnote omitted); *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011); *see also Waldon*, 206 F.3d at 603 (noting that the associated inquiry is an objective one).

Ours is not the first case to raise this particular issue. A trio of recent cases—*United States v. See*, 574 F.3d 309 (6th Cir. 2009), *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011), and *United States v. Carr*, 674 F.3d 570 (6th Cir. 2012)—addressed similar circumstances in which police officers positioned their squad cars to curtail a suspect's ability to leave the scene. In *See*, we held that an investigative detention occurred when an officer "pulled his patrol car in front of [the defendant's] car and parked the patrol car in front of [the defendant's] car so that [the defendant] could not move his vehicle." 574 F.3d at 312-13. In *Gross*, we held that an investigative detention also occurred when an officer "parked his police vehicle directly behind" the defendant's car, effectively blocking the defendant in his parking space. 662 F.3d at 399. In *Carr*, however, we distinguished both cases and held that a consensual encounter occurred when three officers in an unmarked police vehicle spotted the defendant's car parked in one stall of a coin-operated carwash, flashed their blue lights once upon arriving, and stopped at an angle in front of the defendant's car before approaching on foot. 674 F.3d at 573. We found it especially significant that the officers left the defendant "sufficient room to drive either forward [with some maneuvering] or backward out of the [stall]." *Id.*

Our case falls somewhere in the middle. On the one hand, we accept the district court's factual finding that Sergeant Johnson pulled his squad car far enough past the defendant's parked vehicle to allow it to maneuver out of the space, unlike the officers in *See* and *Gross*. On the other hand, maneuvering around Sergeant Johnson's close-in squad car was the only way to leave the scene. Unlike the defendant in *Carr*, Chalmers and Williams did not have the option of simply backing away or taking some other less confrontational route. These facts do not lend themselves

to an easy resolution. It is clear that Williams would be out of luck if the relative position of the squad car was the only relevant factor; the availability of a hypothetical egress would doom his case. However, that factor is not dispositive under the relevant precedent, *see Mendenhall*, 446 U.S. at 554 (directing courts to consider "all of the circumstances surrounding the incident"), and we decline to announce a rule today that would seem to reduce our Fourth Amendment analysis to counting inches on a yardstick. Such a mechanical approach would not serve us well. The ultimate question remains whether the defendant "believed he was . . . free to leave," *see id.*, not whether it was merely physically possible. To answer we must consider the totality of the surrounding circumstances. *Id.*

Several are relevant here—and they convince us that the encounter was more akin to an investigative detention than a run-of-the-mill conversation on a public street. First, Sergeant Johnson did not switch off the alley lights on his squad car when he stopped and got out, instead leaving them pointing in the general direction of Chalmers and Williams throughout the episode. In addition, Sergeant Johnson approached the driver's side door by walking directly in front of the parked vehicle, effectively blocking the only available egress in the process. Finally, once Sergeant Johnson arrived at the driver's side door, he used his flashlight to probe the vehicle's interior and began conversing with Chalmers. These details taken together indicate that Sergeant Johnson was no longer simply "putting questions to" Chalmers and Williams. *See United States v. Williams*, 615 F.3d 657, 663 (6th Cir. 2010). Although no one detail is sufficient on its own here to transform the initial encounter into a compulsory stop, *see Carr*, 674 F.3d at 572-74, it is unlikely that a reasonable person facing a panoply of probing lights and aware that the inquiring officer has further interest in

the interior of his vehicle would believe that he is free to maneuver out of his parking space past the squad car that had blocked the egress a moment earlier.

Thus, at this point, we think a reasonable person in the defendant's shoes, already hemmed into a parking space with a single narrow egress, would no longer feel free to terminate such an encounter. The aggregate effect of Sergeant Johnson's "objective behavior" created a coercive situation in which he clearly communicated to the vehicle's occupants that they were under investigation. *See Waldon*, 206 F.3d at 603. The district court was wrong to conclude otherwise.

The government resists this conclusion based on its assertion that Sergeant Johnson did not undertake sufficiently coercive actions. It is true that we have previously articulated a number of paradigmatic examples of coercive actions, *see United States v. Peters*, 194 F.3d 692, 697 (6th Cir. 1999) (noting that factors to consider in determining whether an encounter is consensual include the threatening presence of several officers, the display of a weapon, some physical touching on one's person, or the use of language or tone of voice indicating compliance with the officer's request will be compelled), and that none are present here. But the list is hardly exhaustive—it is not meant to cover the full range of circumstances that might indicate a seizure has occurred. *See id.* (introducing the list as "[e]xamples of circumstances that might indicate a seizure"). Moreover, the relevant inquiry cannot be reduced to a checklist that treats each potentially relevant action in isolation. We must instead consider the totality of the circumstances surrounding the incident. *See Mendenhall*, 446 U.S. at 544. And doing so leads us to conclude that Sergeant Johnson seized Williams by a "show of authority" when he began asking questions of the occupants in an already-coercive environment. *See id.* at 553.

- 7 -

B.

Having concluded that the initial encounter between Sergeant Johnson and the occupants of the vehicle ripened into an investigative detention before Sergeant Johnson ordered the defendants out, we must now determine whether it was constitutionally permissible. This inquiry turns on the answers to two questions. Did Sergeant Johnson have a "reasonable suspicion" of criminal activity based on "specific and articulable facts" known to him when he first began asking questions of the occupants? *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Was the length of the encounter and the extent of intrusion "reasonably related in scope to the circumstances which justified the interference[?]" *Id.* at 29. We answer both questions in the affirmative and therefore decline to suppress the eventual fruits of the seizure.

Sergeant Johnson had ample reason for suspicion based on a number of converging factors. When he came across Chalmers and Williams, they were sitting in a vehicle, headlights on and engine running, backed into a parking space far away from the entrance to the nightclub. The time was approximately 1:00 a.m. and Sergeant Johnson was already on the lookout for individuals responsible for a rash of recent vehicle break-ins. The unusual behavior of Chalmers and Williams predictably piqued his interest. It is true enough that such factors are "context-based" and "would have pertained to anyone in the parking lot at that time," *See*, 574 F.3d at 314, and without more, likely fall short of giving rise to a reasonable suspicion of criminal activity. But Sergeant Johnson also observed Chalmers and Williams begin "shuffling around" and "moving stuff" on the front floorboard as he approached on foot. Again, while it is true enough that furtive movements do not on their own justify an investigative detention, *see United States v. Caruthers*, 458 F.3d 459, 466-67

(6th Cir. 2006), they did "contribute" to already-heightened suspicions in this instance, *see id.* at 466. Sergeant Johnson further observed that the "unkempt" occupants of the vehicle did not have the appearance of average club patrons. Upon finally arriving at the driver's side door, Sergeant Johnson made perhaps his most significant observation of all: DVD monitors and stereo equipment at Williams's feet that matched the general description of goods stolen on previous occasions. Importantly, we assume that he made this observation before using the full "show of authority" to seize the occupants because the record is less than clear on timing, and we must break any ties in favor of the government. *Moon*, 513 F.3d at 536-37. A factor as specific as this one cannot be dismissed as contextual because it ties Chalmers and Williams to the particular crimes that Sergeant Johnson was on detail to deter, and it suggests the occupants may have been guilty of something more than parking in a high-crime area late at night. *Cf. See*, 574 F.3d at 314 (holding that reasonable suspicion did not exist where the officer "did not suspect the [defendant] of a specific crime"). On this record, it was reasonable for Sergeant Johnson to suspect that something was amiss.

The scope of the ensuing investigation also was reasonably related to the circumstances that justified the detention. *See Terry*, 392 U.S. at 29. Using a flashlight to probe the parked vehicle's interior was not an excessive intrusion given Sergeant Johnson's numerous observations and his existing knowledge that certain goods had been reported stolen from vehicles in the lot. Nor was it excessive to ask Chalmers for his driver's license, to order him out of the vehicle after discovering that the license was suspended, and eventually to detain both occupants in the backs of separate squad cars upon finding common burglary tools in plain view. During the brief detention, the responding officers showed no lack of diligence in trying to confirm their suspicions by promptly

surveying the lot and talking to affected patrons. Nothing about an investigation conducted in such a manner suggests to us that it was improper or drawn-out beyond reason.

Thus, even though we find that Williams was subject to an investigative detention, that detention came after a reasonable suspicion of criminal activity arose and was no more intrusive than necessary to confirm or dispel such suspicion. There is no Fourth Amendment violation here.

III.

For these reasons, we affirm the district court's denial of the motion to suppress.