NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0875n.06

No. 14-3341

**FILED**
Nov 21, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| TERRANCE PETTIS, | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| Defendant-Appellant. | ) | OHIO |
| | ) | |
| | ) | |

BEFORE:     BATCHELDER and ROGERS, Circuit Judges; and BECKWITH, Senior District Judge.[*]

ROGERS, Circuit Judge.   The defendant, Terrance Pettis, appeals his conviction and sentence on the ground that the district court erred in denying his motion to suppress evidence. Pettis contends that the district court, in conducting its Fourth Amendment analysis, incorrectly determined the point at which he was seized.  Pettis argues that as a result, the court, in deciding whether the officers had reasonable articulable suspicion to justify a *Terry* stop, relied on facts that arose after he had been seized, facts that should not have been considered.  Because the record indicates that Pettis had not been seized until the point at which Officer Zielinski asked

---

[*] The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

him to exit the vehicle, and Pettis does not challenge the court's determination that the frisk was justified, the district court correctly denied Pettis's motion to suppress.

On November 14, 2011, around 3:17 a.m., police dispatch reported a burglary at a trailer park in Toledo, Ohio. The dispatcher stated that a man named "Drift"—a man known to the police for his past exploits—had broken into a home in the trailer park and was beating a woman inside.

No more than one minute before this broadcast, Toledo Police Officer Lawrence Emery had seen a gray Dodge Intrepid sitting idle with its lights on, near the entrance of the trailer park. As Emery drove by, the car pulled into the trailer park. Since he did not notice anything particularly suspicious about the car or its occupants, he continued on his patrol. During the suppression hearing, however, Emery noted that there was "hardly anybody on the road, if anybody at all" at that time of night.

After hearing the dispatch, Emery broadcast a description of the gray Dodge Intrepid over the radio because he thought that the vehicle might have "something to do with" the burglary. Emery and Officer Espinoza then went to the trailer park to investigate. The female victim informed the officers that the suspect, "Drift," a black man, drove a 1997 Ford F-150 pick-up truck and lived in the Lagrange and Austin area of Toledo, information subsequently broadcast over the police radio. The victim later admitted, however, that she had not seen Drift leave in his truck. Emery and Espinoza accordingly decided to refocus their attention on the gray Dodge Intrepid, the one vehicle they had seen at the trailer park, and the officers announced over police radio that the car had been last seen heading south.

Officers Zielinski and Holmes heard the radio traffic regarding the burglary and, after learning that "Drift" lived in the Lagrange and Austin area, drove to the corner of Austin and Lagrange. Shortly after, Zielinksi saw a silver Chrysler Concorde driving south on Lagrange, approximately five miles from the site of the burglary/assault. The officers followed the sedan until it parked on Noble. The parties dispute whether the officers initiated a traffic stop as suggested by Zielinski's report,[1] or whether the car pulled over on its own accord upon reaching its destination. They agree, however, that the officers did not activate their police lights or siren, or take any other action to initiate a stop.

After the officers pulled in behind the Chrysler, Zielinski and Holmes approached the passenger's side and the driver's side, respectively. Zielinski questioned the front-seat passenger, Terrance Pettis, who gave a vague response when asked where he was coming from. Pettis also failed to provide either his social security number or identification. Holmes then informed Zielinski that the driver had a concealed carry weapon permit and that there was a gun behind the passenger's seat. At that time, Zielinski asked Pettis to step out of the vehicle for a frisk. After Zielinski discovered a handgun in Pettis's waistband, Zielinski placed Pettis under arrest.

On March 7, 2012, a Toledo grand jury indicted Pettis for violating 18 U.S.C. § 922(g)(1)—Possession of a Firearm by a Convicted Felon. Pettis subsequently moved to suppress evidence of the gun, contending that it was the fruit of an unlawful search. Pettis argued that the Toledo police officers violated his Fourth Amendment rights when they stopped, seized and searched him without reasonable suspicion, probable cause, or voluntary consent.

---

[1] During the suppression hearing, Zielinski testified that he only wrote "initiated a traffic stop" because it involved a "car's traffic." The district court credited Zielinski's explanation.

The district court denied his motion to suppress, finding: (1) that Pettis was seized only after Zielinski asked him to exit the vehicle; (2) that the totality of the circumstances—including information about the burglary/assault and facts acquired during questioning—provided reasonable suspicion to detain; and (3) that Zielinski reasonably believed Pettis could be armed and dangerous. Pettis then pled guilty on the condition that he reserved the right to appeal the district court's denial of his motion. Because Pettis qualified for armed career criminal status, the district court sentenced him to a mandatory minimum 180 months in prison, followed by three years of supervised release.

This appeal followed. Pettis argues that the district court erred when it credited Zielinski's "unreliable, two-year-old memories" to find that the officers had not initiated a traffic stop. In the alternative, Pettis contends that the district court erred in finding that he was seized only after Zielinski ordered him from the car, rather than at the point the officers approached the vehicle. Because both arguments lack merit, the district court correctly dismissed Pettis's motion to suppress.

To begin, the district court did not clearly err when it credited Zielinksi's testimony and found that the officers had not initiated a traffic stop. "Factual findings supporting a district court's ruling on a motion to suppress are upheld unless clearly erroneous." *United States v. Yoon*, 398 F.3d 802, 805 (6th Cir. 2005). Pettis points to Zielinksi's faulty memory[2] and the

---

[2] Pettis explains,

> [D]uring his testimony Zielinski failed to recall key aspects of the stop, *see* R. 18: Tr. Suppression Hr'g (#130–31) (forgetting police discussion of the suspect's truck); R. 18 Tr. Suppression Hr'g (#131) (failing to recall whether he removed other passengers from the sedan), which had occurred almost two years before his testimony. Indeed, Zielinski admitted on the stand that he "wouldn't recall"

inconsistencies between his contemporaneous police report and his testimony at the suppression hearing to show that the district court clearly erred in finding that the officers had not initiated a traffic stop. However, Pettis overlooks two crucial pieces of evidence. First, both parties agree that the officers did not activate their police lights or sirens, or take any other action to initiate a stop. Second, the record supports a finding that the vehicle stopped on its own upon reaching its destination.[3] In light of the "great deference" accorded to the credibility determinations of the district court, *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004), and the need to consider the record on appeal "in the light most favorable to the government," *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998), the district court did not clearly err, in view of the evidence presented.

The district court also correctly determined that, until Zielinski ordered Pettis out of the vehicle, the encounter was consensual. A consensual encounter occurs when "a reasonable person would feel free to terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 201 (2002). Pettis contends that in view of the following circumstances, however, no reasonable person would have believed that he was free to leave after the officers approached the vehicle: (1) the police car followed the sedan for several blocks, at a distance close enough to obtain the sedan's license plate information; (2) the roads were effectively empty during this period; (3) the police immediately pulled in directly behind the sedan when it pulled over; (4) the officers

---

several details in his testimony had he not reviewed official records just before testifying. R. 18: Tr. Suppression Hr'g (#131).

[3] Officer Zielinski testified,

> They had stopped right there on the corner because they were going to a house directly across the street from where they parked. And I know that they were there for some time because after we had left with Mr. Pettis, we booked him, finished our paperwork. During that time I had realized that I still had the female's ID in my pocket. So we drove back to that location, and I pushed the ID through the crack in the door into the vehicle.

approached the vehicle from two sides; and (5) neither Pettis nor any other individuals in the car exited the sedan, "notwithstanding the fact that Zielinski testified that the passengers had supposedly arrived at their destination." However, a review of the record and our circuit precedent indicates that the circumstances listed above did not turn an otherwise consensual encounter into a seizure prior to Zielinski's request that Pettis exit the vehicle.

As a preliminary matter, because the officers did not block the sedan's only means of egress, the encounter was consensual when the officers parked the cruiser curbside, behind the Concorde. "[U]nless there is other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave." *United States v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012) (citing *United States v. See*, 574 F.3d 309, 315 (6th Cir. 2009) (Gilman, J., concurring)). This case differs from one in which an officer uses his cruiser to physically obstruct an individual's ability to depart the scene of the encounter by car. For instance, in *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011), we held that when the officer "blocked" the car in the parking space by parking directly behind the defendant's car, he began an investigatory *Terry* stop. *Id.* at 399. Similarly, in *See*, we held that the officer initiated a *Terry* stop "when he parked his patrol car in front of See's car," such that See could not depart. 574 F.3d at 311–12. And in *United States v. Jones*, 562 F.3d 768 (6th Cir. 2009), we reasoned that a "'seizure' had occurred at the time the Nissan was hemmed in by the unmarked police vehicles." *Id.* at 772–73. Because the gray Concorde was not "hemmed in," blocked, or otherwise obstructed by the police cruiser, the mere fact that the officers parked behind the sedan did not, without more, indicate that Pettis had been seized. As this court explained in *Carr*, "[t]o conclude otherwise would be an endorsement of a 'simplistic, bright-line rule' that a detention

occurs 'any time the police approach a vehicle and park in a way that allows the driver to merely drive straight ahead in order to leave.'" *Carr*, 674 F.3d at 573.

The encounter remained consensual as the officers approached the Chrysler Concorde on foot. Upon exiting the police vehicle, Officer Holmes approached the driver's door while Officer Zielinski approached the passenger's door. "[A]pproaching the vehicle in this manner [with one officer on each side of the car], by itself, does not make the encounter non-consensual." *Carr*, 674 F.3d at 573; *see also United States v. Dingess*, 411 F.App'x 853, 854, 856 (6th Cir. 2011).

Lastly, the officers did not engage in any coercive or intimidating behavior that would make the encounter non-consensual. "[S]o long as the officers do not convey a message that compliance with their requests is required," *Florida v. Bostick*, 501 U.S. 429, 437 (1991), or "induce cooperation by coercive means," officers may approach an individual and "pose questions, ask for identification, and request consent to search luggage" even when they lack any basis for suspecting a particular individual is engaged in criminal activity. *United States v. Drayton*, 536 U.S. 194, 201 (2002). Examples of intimidating or coercive means indicative of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

None of these coercive tactics is present in Pettis's case. Here, the officers did not draw their weapons, nor is there any evidence of physical touching or threatening language or tone. Pettis does imply that when the officers closely followed their vehicle, around 3:00 a.m. on an all

but deserted street, they engaged in conduct that would have led a reasonable person to believe that they were being stopped by the police. However, the fact remains that during this same time period, the officers chose not to activate their lights or siren, or otherwise signal their intent to stop the car. Ultimately, because no indicator of coercion or intimidation was present, the encounter remained consensual. As the district court correctly concluded, it was only when Zielinski asked Pettis to exit the vehicle that the encounter transformed from voluntary to compulsory.

Pettis does not challenge the district court's determination that the officers had reasonable suspicion to detain him at the point Zielinski asked him to exit the car. Nor does he contest the court's finding that the officers had sufficient reason to believe that he was armed and dangerous when they conducted the protective frisk. Consequently, we do not address these issues.

The judgment of the district court is affirmed.