**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a1030n.06

**Nos.  12-6175/12-6187/12-6324**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    **Plaintiff-Appellee,**

**v.**

**KODY EVANS and TOMMIE DUNN,**

    **Defendants-Appellants.**

                      /

FILED
Dec 16, 2013
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE

BEFORE:    **CLAY, SUTTON, and GRIFFIN,** Circuit Judges.

**CLAY, Circuit Judge.**  Defendants entered conditional guilty pleas to charges of armed robbery affecting interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951, and use of a firearm during the robberies in violation of 18 U.S.C. § 924(c).  Defendants conditional pleas preserved their right to appeal the district court's denial of their motion to suppress physical evidence, confessions, and an identification.  Defendants now appeal the denial of that motion, claiming that the police search of the apartment where they were found was unlawful, and that all evidence found in the search, as well as the confession and identification, which Defendants claim were directly related to that search, should have been suppressed.  For the reasons set forth in this opinion, we **AFFIRM** the judgment of the district court.

Nos.  12-6175/12-6187/12-6324

## BACKGROUND

A.    **Factual Background**

During October and November of 2008, the FBI Safe Streets Task Force ("SSTF") investigated a group of seven similar armed robberies at hotels in the greater Memphis, Tennessee area.  In each of these robberies a woman would enter and speak with the desk clerk, and then a few minutes later, two armed men would enter the hotel lobby while brandishing guns and would demand money from the clerk.  In some of these robberies witnesses said that the robbers drove a red Chrysler Sebring, and in others the witnesses reported that the robbers drove a silver Chevrolet Malibu.  In some of these robberies, the robbers also took personal items from the hotel clerks.

Investigator Forrest Bartlett, an officer with the Shelby County Sheriff's Office, was the lead investigator on the robberies and worked with the SSTF.  Because he had no leads based on the eyewitness accounts, Bartlett had local television stations broadcast some of the surveillance footage from the robberies to try to get leads on the robbers.  One tip that the officers received implicated Defendant Tommie Dunn ("Dunn"), Lashawnese Jones ("Jones"), and a man called "Lil Pete" in the robberies.  Further investigation revealed that there was a connection between Jones and Dunn, and that Jones had a red Chrysler Sebring.  After confirming that Jones had received a traffic ticket while driving a red Chrysler Sebring, Bartlett prepared photo arrays including images of Jones and Dunn. One of the victims, LaShonne Straughter, identified Jones from the photo array as the woman who had entered the lobby immediately before the hotel where he worked was robbed.  He also identified Dunn from a photo array as "the guy that robbed me."   (R. 193, Report & Recommendation, Mar. 27, 2012, at 3.)

2

Nos.  12-6175/12-6187/12-6324

Another tip identified Jones, Dunn, and a man named Albert Nelson ("Nelson") as the people involved in the robberies.  That informant told the SSTF that Dunn, Nelson, and Jones lived in the French Village Apartments, in apartment number four ("Apt. #4").  Further investigation in online databases suggested a connection between those three and Defendant Kody Evans ("Evans").  The officers then went to the French Village Apartments, "to see if anybody was home," and to "familiarize themselves with the area . . . before they sought a warrant."  (*Id.* at 4.) (quoting hearing testimony, internal quotation marks omitted).  When they arrived at the apartments they saw a man and a woman, Nelson and Lakendria Thompson ("Thompson"), getting into a silver Chevrolet Malibu.  The officers approached the pair, and asked them if they knew where Dunn and Jones were.  Nelson and Thompson both said that Dunn and Jones could be found in Apt. #4.  Bartlett, while talking to Thompson, noticed a Costco membership card in the car, with the name "Rajeez Shamar" on it, which was the name of one of the hotel clerks who had been robbed.  After further questioning, Thompson stated that she "figured" there were weapons in the apartment.  When the officers informed Thompson as to their purpose there, Thompson became concerned because her eleven-month-old child was in the apartment with Dunn and Jones.  She asked the officers to get the child out of the apartment for her.

The officers then went to the apartment, and after identifying themselves and saying that they were there for the child, they were still refused entry.  While continuing to identify themselves as officers, they heard a voice yell "don't open the door," as well as "a lot of scratching noises, like furniture being moved."  (*Id.* at 6.) An officer went to find the apartment complex manager, who gave the police a key to the apartment, but Bartlett was unable to open the door with the key.  After

a few more verbal demands to open the door were refused, the officers kicked down the door and entered the apartment with their guns drawn.

After entering the apartment, the officers saw Dunn and Evans run away from the door. After securing the apartment, the officers searched the adults, Dunn, Evans, and Kirby Evans ("Kirby"), for weapons, made sure that there were no other people in the apartment, and searched the immediate area around where they wanted to place Dunn, Evans, and Kirby.  Also present was Thompson's child and another child.  Kirby identified herself as the leaseholder, and after removing her and Thompson's child from the apartment, Officer Poindexter received written consent from Kirby to search the apartment.

The search of the apartment revealed a pistol that matched the description of one of the guns used in the robbery, which was found in the tank of a toilet, as well as clothing that matched clothes seen in the surveillance videos of the robberies.  Dunn and Evans were arrested.  Evans declined to make a statement, but Dunn signed confessions to all seven of the motel robberies.  Kirby and Thompson also gave statements; Kirby's statement corroborated Bartlett's account of the entry into the apartment, and added that Evans had tried to hold the door closed.  She also stated that she had a silver Chevy Malibu, that she was the leaseholder of the apartment, and that she had consented to the search.  Thompson stated that she knew that Evans, Jones, and Dunn had been involved in the robberies, and that they had used Jones' red Chrysler Sebring.  At a later hearing, Kirby testified that Jones and Evans lived in the apartment with her, and that Dunn was Jones' boyfriend and would sometimes spend the night.  She also testified that he had spent the two nights prior to the search

there, kept some personal effects in the apartment, and that Evans, Dunn, and Jones all helped pay bills for the apartment.

### B.    Procedural History

Defendants Dunn and Evans were indicted by a federal grand jury in the Western District of Tennessee on December 17, 2008. The twelve-count indictment charged them with robbery in violation of the Hobbs Act, 18 U.S.C. § 1951, and with using a firearm in the robberies in violation of 18 U.S.C. § 924(c).  Each Defendant was charged with six counts of robbery and six counts of use of a firearm in a robbery, on theories of both principal and accomplice liability.

On October 13, 2011, Dunn filed a motion to suppress his confession and the evidence found in the apartment where he was arrested.  On November 1, 2011, Evans filed a motion to suppress items found in the apartment, and to suppress the admission of an identification made via a photo array.  On March 27, 2012, a magistrate judge recommended that the motions be denied.  The district court adopted the magistrate's report and recommendation on May 13, 2012.

On May 15, 2012, Defendants entered conditional pleas of guilty, which allowed them to appeal the district court's denial of their motion to suppress.  On September 18, 2012, the district court sentenced Dunn to a term of 219 months' imprisonment, and Evans to a term of 164 months' imprisonment.

### DISCUSSION

### A.    Standard of Review

Whether a motion to suppress was properly denied is a mixed question of law and fact. Factual findings are reviewed for clear error, while legal conclusions are reviewed *de novo*.  *United*

Nos.  12-6175/12-6187/12-6324

*States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010).  "A factual finding is clearly erroneous when,

on the entire evidence, we are 'left with a definite and firm conviction that a mistake has been

committed.'"  *United States v. Valentine*, 694  F.3d 665, 672 (6th Cir. 2012) (quoting *Anderson v.

City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)).

**B.    Analysis**

Defendants each raise two grounds upon which they claim the district court erred.  Dunn

argues that the lower court should have suppressed the evidence found in the apartment and his

confession, because the police did not have probable cause to enter the apartment, there were no

exigent circumstances justifying a warrantless search,[1] and Kirby's consent to a search could not

override his refusal of consent as a presently objecting co-tenant.  He further claims that his

confession was obtained as a result of this unlawful search, and therefore should have been excluded

as fruit of the poisonous tree.  Evans argues that the search was unlawful, and that regardless, the

police lacked probable cause to arrest him, and that accordingly, the evidence found at the

---

[1]Dunn also claims that the police did not have reasonable suspicion to speak with Nelson and Thompson, so there was no basis for the police to speak to them.  This argument is inapposite. There is nothing in the record that indicates that the police needed reasonable suspicion to speak with Nelson and Thompson; the entire encounter between the police and those two appears to have been voluntary, and there was therefore no "seizure" within the meaning of the Fourth Amendment requiring the police to have reasonable suspicion of criminal activity in order to prolong the encounter. *See, e.g.*, *United States v. Carr*, 674 F.3d 570, 574 (6th Cir. 2012) ("When the officers asked Carr to exit the vehicle, the encounter transformed from voluntary to compulsory. Once a consensual encounter escalates to the point where the individual is seized, the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment.") (internal quotation marks omitted).

apartment, as well as his post-arrest identification, should have been suppressed.  We examine each of these claims in turn.

### 1.      Exigent Circumstances

It is undisputed that the police did not have a warrant to enter the apartment.  The government claims that the entry was justified by exigency, and that the officers were given consent for the subsequent search.  Defendants claim that the police should not have entered the apartment, and that accordingly, the evidence found during the search of the premises must be suppressed.

"Police officers, it has long been true, may not enter a private home without a warrant absent an exigency or consent." *Smith v. Stoneburner*, — F.3d —, 2013 WL 1920874, at \*2 (6th Cir. May 10, 2013) (citing *Payton v. New York*, 445 U.S. 573, 590, (1980)).  As the Supreme Court has recently explained:

> [T]he warrant requirement is subject to exceptions. "One well-recognized exception," and the one at issue in this case, "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. —, —, 131 S. Ct. 1849, 1856 (2011) (internal quotation marks and brackets omitted). A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search, including law enforcement's need to provide emergency assistance to an occupant of a home, *Michigan v. Fisher*, 558 U.S. 45, 47–48 (2009) (*per curiam*), engage in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42–43(1976), or enter a burning building to put out a fire and investigate its cause, *Michigan v. Tyler*, 436 U.S. 499, 509–510 (1978). As is relevant here, we have also recognized that in some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence. *See Cupp v. Murphy*, 412 U.S. 291, 296 (1973); *Ker v. California*, 374 U.S. 23, 40–41 (1963) (plurality opinion). While these contexts do not necessarily involve equivalent dangers, in each a warrantless search is potentially reasonable because "there is compelling need for official action and no time to secure a warrant." *Tyler*, 436 U.S., at 509.

*Missouri v. McNeely*, — U.S. —, 133 S. Ct. 1552, 1558–59 (2013).  "The Sixth Circuit has identified four areas wherein the Supreme Court recognizes exigent circumstances: hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a subject's escape, and risk of danger to the police or others."  *United States v. Johnson*, 457 F. App'x 512, 516 (6th Cir. 2012) (citing *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003)).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)); *accord Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010).  Thus, the warrantless entry into the apartment does not trigger the exclusion of evidence so long as the officers had an "objectively reasonable belief," *Johnson*, 617 F.3d at 868, that the circumstances justified immediate entry.

In this case, the police claim that their entry into the apartment was motivated by a fear that Defendants would attempt to barricade the apartment, and that there was a risk to the infant child they knew to be inside.  The magistrate judge found that the officers demonstrated that these beliefs met the standard of objective reasonableness given in *Johnson*, 617 F.3d at 868.  ("Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception.  Nor do officers need to wait for a potentially dangerous situation to escalate into public violence in order to intervene.  [T]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.") (internal citations and quotation marks omitted, alteration in original).  And even if the officers were primarily interested in making an

8

arrest, rather than protecting the child—and there is no evidence to support that proposition—the entry was reasonable so long as it was objectively justifiable.  *Brigham City*, 547 U.S. at 404–05.

We find that the magistrate judge was correct.  The officers had an objectively reasonable belief that the occupants of the apartment were armed.  This belief was based on the knowledge that at least one person who was a suspect in a series of armed robberies was in the apartment, and the word of Thompson.  Reasonable belief that a suspect is armed, and that the suspect has shown a willingness to use armed force previously is, on its own, sufficient to create exigent circumstances. *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006).

In addition to the reasonable belief that the occupants were armed, the officers also knew that a small child was in the apartment, and that the child's mother was worried about what would happen if there was a confrontation.  *See, e.g.*, *Zar v. Payne*, 760 F. Supp. 2d 779, 789 (S.D. Ohio 2011) (No exigency where baby was visible from door, parent had not told cops that the baby was in danger, and police could see that the child was unharmed).  They further believed that there was the possibility that the suspects might barricade themselves in the apartment, and that would significantly increase the dangers of any attempt to apprehend the occupants.  Finally, because the police had both identified themselves at the door and been in a position where they could be observed from the apartment, there was at least a reasonable fear that the occupants might try to destroy evidence, such as items taken from the wallets of victims.

Contrary to the arguments of the concurrence, the police had a reasonable basis to believe that criminal activity was occurring in the apartment which could have resulted in the destruction of evidence.  Upon arrival at the residence, the police officers announced who they were and that

they were there to retrieve the child.  The occupants of the apartment refused admittance to the police, and were heard moving furniture.  Given that the police had a reasonable basis to believe that robbery suspects were in the apartment, that the police had been refused entry to check on the welfare of the child or to remove the child, and that the police heard what to them sounded like furniture being moved, the police were justified in believing that the child could be in danger or that the suspects could be barricading the apartment or destroying evidence.  It is important to note that at the time they sought entry to the apartment, the police had no knowledge that Evans, who was on the premises, was the child's father; the officers only knew that the child's mother was apprehensive about the child's welfare or safety and requested his immediate removal from the apartment. Therefore, the officers, having been refused entry after announcing themselves and their intention to retrieve the child, and having heard the movement of furniture, had ample cause to fear that 1) the apartment was being barricaded; 2) the child was in danger; or 3) the apartment's occupants could have been destroying evidence.  Separately, any one of these three factors would have been sufficient to create an exigency justifying the police entry into the apartment without a warrant.  The fact that all three factors were present renders the police officers' actions in entering the apartment without a warrant all the more justifiable.  Accordingly, the entry into the apartment survives constitutional scrutiny under the Fourth Amendment.

## 2.    Search of the Apartment

After the officers secured the apartment, they asked the adult occupants—Dunn, Kody Evans, and Kirby Evans—who held the lease on the apartment.  Kirby Evans stated that she was the leaseholder.  Officer Bartlett had Sergeant Joseph Poindexter take Kirby and the two children

outside.  While outside, Sgt. Poindexter asked Kirby if the police could search the apartment.  Kirby

then signed a form giving her consent to search the apartment.  The officers then searched the

apartment, where they found a revolver and clothing that matched clothes seen on the surveillance

footage of the robberies.  Defendants now claim that the consent for the search was defective.  Dunn

claims that because he was a presently objecting co-tenant, the police gained consent improperly by

removing Kirby from his presence in order to obtain that consent.

A search conducted after consent that is given "freely and voluntarily" is valid.  *Bumper v.*

*North Carolina*, 391 U.S. 543, 548 (1968).  In this case, there is no dispute that Kirby gave her

consent to search the apartment.  Dunn claims that despite Kirby's consent, his consent was also

needed in order for the search to be permissible, because he often stayed at the apartment.  The

magistrate judge rejected this argument, and so do we.

Any individual who has actual common authority, *United States v. Matlock*, 415 U.S. 164,

170–71 (1974), or apparent common authority, *Illinois v. Rodriguez*, 497 U.S. 177, 182–87 (1990),

over an area may give officers permission to conduct a search that they are entitled to rely upon.

In this case, the search was conducted once Kirby gave her consent.  Kirby was the sole holder of

the lease, and had the only key to the apartment.

While Dunn claims, correctly, that police cannot obtain consent by removing a "potentially

objecting [co-]tenant . . . for the sake of avoiding a possible objection," *Georgia v. Randolph*, 547

U.S. 103, 122 (2006), neither the magistrate nor the district court found any evidence that the police

had done so here.  Kirby had the full authority to give the police permission to search the apartment,

and having done so, the search was lawful.

Nos. 12-6175/12-6187/12-6324

### 3. Arrest of Evans

Evans argues that his arrest was unlawful, and that because of that, the post-arrest eyewitness identifications of him as one of the robbers should have been excluded. As an initial matter, an eyewitness identification of a person of interest is unlikely to be suppressed as a result of an illegal arrest. *See United States v. Crews*, 445 U.S. 463, 472–73 (1980).[2] In this case, Evans' connection to the other suspects was known before the search and arrest, and the identification could have proceeded regardless of any Fourth Amendment violation during the search or arrest. *See id.* at 471–72. The magistrate judge recommended that the district court find that probable cause existed to sustain the arrest, and we agree with that recommendation.

There is probable cause for an arrest when there is a fair probability that the suspect has committed a crime. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). The determination as to probable cause is based on the jurisdiction's law at the time of the occurrence. *Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012). An arrest without probable cause violates the Fourth Amendment. *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003); *Ingram v. City of Columbus*, 185 F.3d 579, 593–93 (6th Cir. 1999) ("It is a well-settled principle of constitutional law that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment."); *accord Patrizi* 690 F.3d at 464.

---

[2] The Government claims that the *Crews* decision stands for the proposition that an eyewitness identification of a defendant's face in a photo array can never be excluded as the fruit of an illegal search. That is a patently false reading of the case. *See id.* at 472 ("This is not to say that the intervening photographic and lineup identifications—both of which are conceded to be suppressible fruits of the Fourth Amendment violation—could not under some circumstances affect the reliability of the in-court identification and render it inadmissible as well.")

When the officers completed their search of the apartment, they had the following evidence: a general description of a suspect matching Evans; evidence from various databases linking Evans with the other suspects; evidence that Evans was found in an apartment with two positively identified suspects; knowledge that he had attempted to block the officers' entry and then had attempted to flee; physical evidence found in the apartment; two cars matching the descriptions of the cars used in the robberies that were found near the apartment; and a Costco card belonging to a victim who had been seen in one of the vehicles.

While "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), the police had far more than that in this case. Prior investigation had tied Evans to the other suspects, he was found nearby to evidence linked to the robberies, and he tried to flee the scene. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Accordingly, we find that there was probable cause to support the arrest of Defendant Evans, and consequently, no basis upon which to exclude the post-arrest identification.

### 4.    Dunn's Confession

Dunn moves to suppress his confession. Although the confession was obtained after he was properly advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Dunn claims that the confession was the fruit of the poisonous tree, *Wong Sun v. United States*, 371 U.S. 471, 491 (1963). Because, he claims, the search of the apartment and the arrest of Evans were unlawful, his confession should be excluded under the rule of *Brown v. Illinois*, 422 U.S. 590, 603 (1975).

Nos.  12-6175/12-6187/12-6324

Because we find that neither the search nor the arrest of Evans was unlawful, Dunn's argument for

suppression is effectively precluded and we need not address it.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

Nos.  12-6175/12-6187/12-6324

GRIFFIN, Circuit Judge, concurring in the judgment.

I agree with the majority in most respects and concur in the judgment.  I write separately to respectfully disagree with the majority's conclusion regarding the lawfulness of the officers' warrantless entry into the residence.  In my view, the entry was not justified by exigent circumstances and thus violated the Fourth Amendment.  However, despite the lack of exigent circumstances, I concur in the result because the residence's tenant consented to the search.  Accordingly, the district court did not err by denying defendants' motion to suppress.  I join in the remaining sections of the majority's opinion.

The Fourth Amendment provides that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  And the Supreme Court has instructed that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks omitted).  Accordingly, warrantless entries into the home are "presumptively unreasonable" under the Fourth Amendment. *Id.* at 586.  However, this presumption of unreasonableness can be "overcome," *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam), if the government can show that a warrantless entry was justified by the presence of exigent circumstances.  *United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2005).

Significantly, the Supreme Court has repeatedly emphasized that a finding of exigency is proper only where, under the circumstances, it would be unreasonable to require officers to obtain a warrant because they must act immediately and swiftly to prevent some serious harm.  *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552, 1559 (2013) ("[I]n each [area in which the Court has

15

Nos.  12-6175/12-6187/12-6324

found an exigency,] a warrantless search is potentially reasonable because there is *compelling need*

for official action and *no time* to secure a warrant." (emphasis added, internal citation and quotation

marks omitted)); *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (exigent circumstances are "real

immediate and serious consequences" that would occur if an officer "postponed action to get a

warrant" (quoting *McDonald v. United States*, 335 U.S. 451, 460 (1948) (Jackson, J., concurring).

Here, the majority notes the officers had a reasonable belief that (1) defendants were in the

apartment, armed; and (2) defendants were participants in the series of motel robberies the officers

had been investigating.  These two factors form the primary basis on which the majority finds an

exigency.  However, the mere presence of weapons in a residence does not in itself create an

exigency. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).  In *United States v. Bates*, this

court held that the presence of weapons is sufficient to create an exigency only if the government

is able to show that officers "possessed information" not only that a suspect was armed, but was

"likely to use a weapon or become violent."  84 F.3d 790, 795 (6th Cir. 1996).

To that end, the majority relies on *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir.

2006).  There, officers entered a suspect's fenced-in backyard and house without a warrant after

reports that shots had been fired from the backyard; upon arrival, the officers knocked and no one

answered. *Id.* at 526.  This court reasoned that:

> The officers' confirmed information—that someone at the . . . residence had fired a
> gun six times, that no one had entered or left the residence since the shots were fired,
> and that no one had answered the first knock at the door—made it reasonable for
> them to believe that someone inside the house was willing to use a weapon and thus
> that an exigent circumstance existed.

16

*Id.* at 529.  Relying on *Causey*, the majority holds that the fact that the present defendants were suspects in the motel robberies was enough to infer defendants' willingness to use the weapons they suspected were in the apartment.  In my view, this is a strained reading of *Causey* and inconsistent with *Bates*.  The *Causey* court recognized, consistent with *Bates*, that "willingness to use a weapon" required more than a generalized belief that the suspects had weapons and might be violent people—the standard requires that the government show some additional indicia that the suspects were about to use weapons or were about to otherwise act violently.  *Id.*; *see also Bates*, 84 F.3d at 795 (no exigent circumstances found where, without more, officers reasonably believed that suspect was inside apartment with a gun).  Unlike in *Causey*, here there were no shots fired, nor was there any evidence that defendants were "likely to use . . . weapon[s] or become violent."  *Bates*, 84 F.3d at 795.  In my view, the mere fact that defendants were suspects in the robberies does not, without more, establish their "willingness to use . . . weapon[s]" as that concept was applied in *Causey* and *Bates*, nor does it otherwise give rise to a reasonable belief that "real immediate and serious consequences" would occur if the officers "postponed action to get a warrant." *Welsh,* 466 U.S. at 751.

Moreover, there was no reason to believe that defendants were about to harm anyone.  The majority correctly notes that there was a child in the apartment with defendants.  Defendant Evans is the child's father.  The child's mother, Lakendria Thompson, told the officers that her child was in the apartment and that she wanted them to remove the child from the apartment.  However, she made this request only after the officers made clear that they were investigating defendants.  To this end, the majority and I interpret the record quite differently.  It is clear from my review of the record

that Thompson was not fearful that defendants would harm her child.  Rather, she was concerned that her child would be injured during the officers' potential forceful entry into the apartment. Officer Bartlett confirmed as much at the suppression hearing when he testified that Thompson "wanted her child out of the apartment *before we did anything*."  (Emphasis added.)  In this regard, the majority notes that Thompson was "worried about what would happen *if there was a confrontation* [between the police and defendants]."  (Emphasis added.)  There is simply no testimony in the record that Thompson was worried that defendants would harm the child, requiring immediate warrantless entry by the officers—that the officers were unaware that Evans was the child's father at the time of the warrantless entry does nothing to change this fact.  Accordingly, there is nothing in the record to indicate that the officers had reason to believe that the child would have been harmed if they had taken the time to obtain a warrant.

The majority also notes that the officers were concerned about the possibility that defendants might barricade themselves in the apartment.  Although this court has acknowledged that the presence of a barricade "may be considered a relevant factor in determining whether exigent circumstances are present," *Bates*, 84 F.3d at 797 (citing *United States v. Stewart*, 867 F.2d 581, 585 (10th Cir. 1989), here, there is no evidence that a barricade ever, in fact, occurred.  The only evidence in the record regarding a barricade was the officers' subjective speculation that one *might* occur.  Moreover, even if there had in fact been a barricade, this court has previously found that the presence of a barricade alone is not enough to support a finding of exigency unless the officers possess additional "information indicating that the barricade would create a serious impediment to their quick entry into the apartment or place their safety in peril."  *Bates*, 84 F.3d at 797.  Officer

Nos. 12-6175/12-6187/12-6324

Bartlett testified that he was worried about a barricade situation "due to the violence of the robberies," but did not identify any other reason why he was concerned about a barricade situation.

The majority also cites the potential destruction of evidence as a factor in support of a finding of exigency. Likely destruction of evidence is a recognized basis for an exigency. *United States v. Radka*, 904 F.2d 357, 362 (6th Cir. 1990). However, the record is bereft of any evidence related to a concern over destruction of evidence. The officers did not testify that potential destruction of evidence was a concern of theirs, nor did the magistrate's report and recommendation even mention this issue. The district court's opinion and order adopting the report and recommendation also fails to mention destruction of evidence. It appears that the majority is basing its decision, in part, on its own mere speculation.

In sum, I disagree with the majority that any of the facts support a finding of exigency. Nothing here was of such urgency or severity that the officers were excused from adhering to the Fourth Amendment's general rule of obtaining a warrant before entering the apartment. *See McNeely*, 133 S. Ct. at 1559; *Welsh,* 466 U.S. at 751 (1984).

However, even though I would hold that the officers' entry into the apartment violated the Fourth Amendment, I would affirm the district court's denial of the motion to suppress on the alternative basis of consent. As the majority correctly notes, once the officers were inside the apartment, the sole tenant, Kirby, gave the officers valid consent to search the premises. Kirby's consent provided the officers with an independent constitutional basis on which to conduct their search; accordingly, suppression of the fruits of that search is not warranted. *See Murray v. United States*, 487 U.S. 533, 541–43 (1987) (following officers' illegal initial entry, a subsequently obtained

valid warrant could provide an independent source for the search and seizure); *United States v. Calhoun*, 49 F.3d 231, 234–35 (6th Cir. 1995) (following an initial illegal entry and sweep of an apartment, valid consent provided an independent source for the search and seizure).  At oral argument, defendant Dunn's counsel asserted that Kirby's consent was not voluntary because at the time it was obtained the officers had already made their warrantless entry.  However, in another case involving an unconstitutional entry and protective sweep, this court concluded that the defendant's consent to search the premises was voluntary where, as here, she signed a consent form and there was no indication that she did not comprehend what the officers told her.  *Id.* at 235.  To the extent defendants have a remedy for any damages they incurred as a result of the officers' unconstitutional warrantless entry, it is a *Bivens*[3] claim.  In light of the valid consent the officers obtained, suppression of the evidence derived from the search is not warranted.

For these reasons, I concur in the judgment.

---

[3]*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).