[Cite as *State v. Strong*, 2019-Ohio-2888.]

**Released July 8, 2019**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 18CA3663 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | <u>DECISION AND JUDGMENT</u> |
| | : | <u>ENTRY</u> |
| JOHN C. STRONG, | : | |
| | : | |
| Defendant-Appellant. | : | |

_____
<u>APPEARANCES:</u>

Timothy Young, Ohio Public Defender, and Allen M. Vender, Assistant State Public Defender, Columbus, Ohio, for Appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for Appellee.
_____

Smith, P.J.

{¶1} This is an appeal from a Ross County Court of Common Pleas judgment entry finding Appellant, John Strong, guilty of three counts of aggravated possession of drugs, one count of possession of cocaine, one count of possession of heroin, one count of illegal manufacture of drugs, one count of illegal assembly or possession of chemicals for the manufacture of drugs and one count of carrying a concealed weapon. Appellant was found guilty and sentenced by the trial court after he pled no contest to the charges as a result of the trial court's denial of his motion to suppress. On appeal, Appellant contends that the trial court erred in overruling his motion to suppress. Upon review, we find no merit to Appellant's argument. However, as noted by Appellant in his brief, it appears the judgment entry of sentence dated August 24, 2018, as well as the nunc pro

tunc entry that was subsequently filed on September 18, 2018, both incorrectly state that Appellant pleaded guilty to the charges at issue, rather than no contest. It further appears from a review of the online docket that this error remains uncorrected. Thus, pursuant to App.R. 9(E), we instruct the trial court to issue another nunc pro tunc order to correct the clerical error in both the judgment entry of sentence and nunc pro tunc entry already filed, and to reflect that Appellant pleaded no contest rather than guilty. Accordingly, we overrule Appellant's sole assignment of error and affirm the judgment of the trial court with instructions.

FACTS

{¶2} An indictment was filed in the Ross County Court of Common Pleas on November 17, 2017, charging Appellant with multiple felony counts as follows:

Counts 1 and 2: Aggravated Possession of Drugs, felonies of the fifth degree in violation of R.C. 2925.11;

Count 3: Possession of Cocaine, a felony of the fifth degree in violation of R.C. 2925.11;

Count 4: Aggravated Possession of Drugs, a felony of the second degree in violation of R.C. 2925.11;

Count 5: Possession of Heroin, a felony of the second degree in violation of R.C. 2925.11;

Count 6: Illegal Manufacture of Drugs, a felony of the first degree in violation of R.C. 2925.04;

Count 7: Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, a felony of the second degree in violation of R.C. 2925.041; and

Count 8:  Carrying Concealed Weapons, a felony of the fourth degree in violation of R.C. 2923.12.

The indictment stemmed from an investigation that originated with a tip relayed to local law enforcement by the Ohio Bureau of Criminal Investigation (hereinafter "BCI").

{¶3} The record reveals that on February 9, 2017, Detective Jason Gannon, who is employed with the Ross County Sheriff's Office and U.S. 23 Major Crimes Task Force, was contacted by Agent Willis from BCI's narcotics unit, who advised he had received a tip from a drug overdose victim while he was investigating several drug overdoses that had occurred in Brown County.  Detective Gannon was informed that Agent Willis had received information indicating two individuals, John Strong, Appellant herein, and Terry Titer, would be at a Dollar General store on U.S. Route 50 outside of Chillicothe and that they were going to be making a drug transaction with a subject known as "Black Mike."  Gannon knew that both Appellant and Titer were currently being investigated in Pike County and southern Ross County based upon the suspicion they were trafficking in drugs.  Further, Gannon knew "Black Mike" as Mike Denney because he had had several cases with him related to trafficking in heroin.

{¶4} As a result of the tip, Detective Gannon requested assistance from Major Lewis, who worked with the Pike County Sheriff's office and U.S. 23 Major Crimes Task Force, and also requested that the Ross County Sheriff send a marked vehicle to the area. Gannon then went to the Dollar General store in an unmarked vehicle to conduct surveillance.  While there, he observed a red Ford Ranger truck, occupied by two males, pull onto the lot.  Although his view into the truck was obscured and he could not identify the males, he got the license plate number of the truck.  Gannon then observed Denny

arrive and go into the store. When Denney exited the store he went to the side of the store where the truck was parked, and then drove away in a gray Acura. At that time Gannon requested that the marked cruiser stop Denney for driving under suspension, but the marked cruiser had been called away to another incident and could not accommodate Gannon's request.

{¶5} Thereafter, while Detective Gannon was following Denney, Major Lewis informed him that Appellant and Titer had been staying at a house located at 2140 Valley Road and that both of the men had outstanding arrest warrants issued by the Pike County Probation Department. Detective Gannon then drove past the Valley Road address, where he saw the same red Ford Ranger truck he had seen at the Dollar General store. No one was in the truck at that time. Gannon confirmed the license plate matched and then contacted Major Lewis. It was then decided that Gannon, Lewis and other members of law enforcement would meet to prepare a plan.

{¶6} The record indicates that Gannon, Lewis, Detectives Max Adair and John Winfield from the Ross County Sheriff's office, BCI Agent Schrader, Agents Weaver and Holdren from the Pike County Probation Department, and another Pike County Sheriff's Deputy met at Gibson's store, which was located nearby. While there, they devised a plan to go to the Valley Road address to conduct a "knock-and-talk" because the residents at that address were on probation. Before leaving, Detective Gannon provided the officers with all of the information he had regarding the BCI tip, his surveillance at Dollar General, and the fact that the red truck was parked at the Valley Road address. The Pike County probation officers also confirmed that the arrest warrants were active during the meeting.

{¶7} The record further reveals that each of these officers left the store in a caravan of vehicles headed for the Valley Road address, with a plan that two officers would approach the front door, two officers would go around to the rear of the residence, and the other officers, including Detective Winfield, would cover the cars parked out front. Major Lewis was in the front of the caravan and as he pulled into the driveway he was able to view and identify Appellant and Titer sitting in the parked truck. He marked on the radio to the other officers that Appellant and Titer were in the truck. Based upon this information, Detective Winfield, who was in the back of the caravan, pulled his cruiser behind the truck, activated his lights, and then immediately approached the driver's side of the truck with his gun drawn. The record reveals that as he approached the truck, he identified Titer sitting in the passenger seat. He also observed Appellant stuffing something into his coat pocket.

{¶8} As a result, he ordered Appellant to put his hands on the steering wheel and then ordered him to exit the vehicle. As Appellant was exiting, Detective Winfield asked Appellant his name, to which he replied that he was John Strong. Detective Winfield then conducted a pat-down search which resulted in the recovery of a firearm, as well as rolls of money, a white, powdery substance, and a tan, tar-like substance, suspected to be narcotics. A subsequent search of the truck resulted in the discovery of an active, one-pot meth lab in a book bag located behind the driver's seat of the truck.

{¶9} Appellant initially pled not guilty to the charges contained in the indictment and then moved the court to suppress all evidence seized as a result of the search of his person and vehicle. In his motion, Appellant argued the officers stopped, seized and detained him prior to becoming aware there was an active warrant for his arrest, and

without reasonable suspicion he had committed a criminal offense, as there was no traffic violation observed. Appellant primarily argued that the subsequent discovery of an arrest warrant did not retroactively validate an otherwise illegal stop. Appellant based his argument on the fact that none of the officers' written reports included information indicating they were aware of the existence of the warrant prior to the stop. Appellant also argued the officers failed to positively identify him before seizing him.

{¶10} Detectives Jason Gannon, John Winfield and Max Adair all testified on behalf of the State during the suppression hearing. Each detective testified that although they did not reference in their written reports their knowledge of the active warrant prior to going to the Valley Road address, they were, in fact, aware of it and had confirmed it was still active. They also each testified that they clearly heard Major Lewis mark on the radio that Appellant and Titer were in the truck as they were approaching.

{¶11} The trial court ultimately denied Appellant's motion, relying in part on the holding of *State v. Williams*, 2nd Dist. Montgomery No. 22535, 2008-Ohio-6030, for the proposition that "[b]ecause of the outstanding warrant, Defendant had no reasonable expectation of privacy from arrest and search by law enforcement." Appellant thereafter changed his not guilty pleas to pleas of no contest to all counts of the indictment. The trial court found him guilty and sentenced him to an aggregate sentence of nine years in prison. It is from the trial court's final judgment and sentence that Appellant now appeals, setting forth a single assignment of error for our review.

ASSIGNMENT OF ERROR

I.     "THE TRIAL COURT ERRED IN OVERRULING JOHN STRONG'S MOTION
       TO SUPPRESS, IN VIOLATION OF THE FOURTH AMENDMENT TO THE
       UNITED STATES CONSTITUTION."

{¶12} In his sole assignment of error, Appellant contends the trial court erred in overruling his motion to suppress. Appellant sets forth two issues for review under this assignment of error. First, Appellant questions whether an individual who is subject to an outstanding arrest warrant retains privacy interests that are required to challenge an illegal search or seizure. Appellant contends the second issue presented for review involves an analysis of whether he was illegally detained. The State responds by arguing that law enforcement knew Appellant had an outstanding warrant, knew he was in the truck at issue, and therefore had a basis to approach the truck and then search Appellant incident to arrest on the warrant. Thus, the State argues Appellant's sole assignment of error is without merit. We begin with a look at the proper standard of review when analyzing a trial court's ruling on a motion to suppress.

Standard of Review

{¶13} Appellate review of a trial court's ruling on a motion to suppress is "a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003–Ohio–5372, 797 N.E.2d 71, ¶8. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses. *State v. Roberts*, 110 Ohio St.3d 71, 2006– Ohio–3665, 850 N.E.2d 1168, ¶100; citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Consequently, in its review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Belton*, 149 Ohio St.3d 165, 2016–Ohio–1581, 74 N.E.3d 319, ¶100; *State v. Landrum*,

137 Ohio App.3d 718, 722, 739 N.E.2d 1159 (4th Dist. 2000). However, an appellate court determines as a matter of law, without deferring to the trial court's conclusions, whether the trial court reached the correct legal conclusion in analyzing the facts of the case. *Belton* at ¶100; *Roberts* at ¶100; *Burnside* at ¶8.

Fourth Amendment Principles

{¶14} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 134 Ohio St.3d 191, 2012–Ohio–5047, 981 N.E.2d 787, ¶15. This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion of the evidence obtained from the unreasonable search and seizure at trial. *Id.*

{¶15} The Supreme Court of the United States recognizes three types of police-citizen interactions: (1) a consensual encounter, which requires no objective suspicion; (2) a brief, investigatory stop or detention, which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) an arrest, which must be supported by probable cause. *United States v. Williams*, 525 Fed.Appx. 330, 332 (6th Cir. 2013); *Florida v. Royer*, 460 U.S. 491, 501–507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

{¶16} When a police officer merely approaches a person in a public place, engages the person in conversation, requests information, and the person is free to decline to answer and walk away, the encounter is considered consensual and not subject to Fourth Amendment protection. *State v. Blankenship*, 4th Dist. Ross No. 13CA3417, 2014–Ohio–3600, ¶11; citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115

L.Ed.2d 389 (1991). No Fourth Amendment rights are invoked with a consensual encounter because there is no seizure. *Id.*; citing *Bostick* at 434.

{¶17} Conversely, a seizure occurs when, in view of all of the circumstances surrounding the incident, the police officer has either by physical force or a show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests and walk away or otherwise terminate the encounter. *State v. Travis*, 4th Dist. Scioto No. 06CA3098, 2008–Ohio–1042, ¶10; citing *State v. Williams*, 51 Ohio St.3d 58, 554 N.E.2d 108 (1990). "While no 'litmus-paper test [exists] for distinguishing a consensual encounter from a seizure,' * * * certain factors may indicate that a seizure has occurred." *Blankenship* at ¶13; quoting *Royer* at 506. Factors to consider in determining whether a seizure has occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); See also *Blankenship* at ¶13 (listing additional factors to consider).

{¶18} The "investigative stop" exception to the Fourth Amendment warrant requirement allows a police officer to temporarily detain a person for the limited purpose of investigating suspected criminal behavior. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991). While an investigative stop constitutes a seizure, it does not violate the Fourth Amendment as long as the officer has a reasonable suspicion, based upon specific and articulable facts, that criminal activity "may be afoot" (i.e., that a person has committed or is about to commit a crime.) *State v. Abernathy*, 4th Dist. Scioto No.

07CA3160, 2008–Ohio–2949, ¶22–24; quoting *Terry v. Ohio*, 392. U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶19} " 'The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances.' " *Eatmon*, 2013–Ohio–4812, ¶13; quoting *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044, paragraph one of the syllabus (1980). The totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *United States v. Arvizu,* 534 U.S 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (overruled in part on separate grounds by *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); quoting *U.S. v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

## Legal Analysis

{¶20} We initially note that Appellant's motion to suppress raised a limited argument. As set forth above, law enforcement believed they would locate Appellant inside a residence at 2140 Valley Road and as such, they planned to conduct a "knock-and-talk."[1] In his motion, Appellant expressly stated he was not challenging law enforcement's right to conduct a knock-and-talk in the driveway of the residence, but rather he was challenging "his seizure prior to being positively identified since no traffic violation was observed and there was a lack of probable cause that a crime was

---

[1] We explained in *State v. Ash*, 4th Dist. Pickaway No. 15CA1, 2015-Ohio-4974, ¶12 that "[t]he Fourth Amendment to the United States Constitution permits this "knock and talk" investigative technique when law enforcement approaches a front door of a residence without a search warrant." (internal citations omitted). We further noted in *Ash* that the occupant of the residence has "no duty to open the door and speak with the officer." *Id.*

committed." This argument was based upon the premise that he was stopped and seized before his identity was known. Thus, Appellant's argument raised a limited challenge to his initial stop.

{¶21} More specifically, it was Appellant's contention that law enforcement was not aware he had an outstanding warrant until after they seized him. Appellant argued that a "later discovered warrant itself does not retroactively legitimize the search." Appellant relied upon *State v. Gardner*, 135 Ohio St.3d 99, 2012-Ohio-5683, 984 N.E.2d 1025 in support of his argument. Gardner was a passenger in a legally parked car, the driver of which was arrested on an active warrant while walking out of a gas station. *Id.* at ¶8-9. When the arresting officer observed Gardner reach into the back of his shorts, he ordered Gardner to place his hands on the dashboard, ordered him out of the car, handcuffed him and then patted him down. *Id.* at ¶9-10. Although the pat-down did not reveal a weapon, contraband was found and Gardner was placed under arrest. *Id.* at ¶11. Police later determined Gardner was the subject of an arrest warrant for a traffic violation. *Id.* at ¶12.

{¶22} Gardner's motion to suppress was denied based upon the trial court's belief that the subsequently discovered arrest warrant "cleansed" the allegedly illegal stop, as explained in *Dayton v. Click*, 2nd Dist. Montgomery No. 14328, 1994 WL 543210 (Oct. 5, 1994). *Id.* at ¶13. However, upon review, the Supreme Court of Ohio, found that *Dayton v. Click* was "not good law." *Id.* at ¶19. As a result, it reversed the trial court's decision denying Gardner's motion to suppress and remanded the matter for further proceedings. *Id.* at ¶24. In reaching its decision, the *Gardner* Court rejected the State's argument that an individual who is the subject of an outstanding arrest warrant forfeits all

expectations of privacy protected by the Fourth Amendment to the U.S. Constitution and Ohio Constitution. *Id.* at ¶1.

{¶23} We further note that in *Gardner*, the Supreme Court of Ohio explained that *Dayton v. Click* and its progeny, including *State v. Williams,* 2nd Dist. Montgomery No. 22535, 2008-Ohio-6030, which was relied upon by the trial court below, stood for the following proposition:

> [A]n individual subject to an arrest warrant has 'no reasonable expectation
>
> of privacy in being free from being stopped arbitrarily by police' because
>
> the warrant is the embodiment of a court's command to arrest the
>
> individual. *Id.* at ¶20 (internal citations omitted).

The Court also noted that under *Dayton v. Click*, " '[t]he mere existence of an outstanding warrant, in other words, renders a seizure lawful, whether or not the officer is aware of the warrant at the time of the seizure.' " Citing *State v. Gray*, 2nd Dist. Montgomery No. 22688, 2009-Ohio-1411, ¶12.

{¶24} The *Gardner* Court then went on to acknowledge that while "[i]t is true that a person subject to an arrest warrant does not enjoy the full panoply of privacy rights that other individuals enjoy" and that an "arrest warrant authorizes the police to enter into an individual's home to seize him[,]" the line of cases supporting such holdings "presupposes that the police knew that there was a warrant for the individual's arrest when entering a home to make an arrest." *Id*. at ¶22. Thus, the Court drew a distinction between cases where law enforcement had knowledge of an active, outstanding warrant at the time of the initial encounter, versus a "fortuitous subsequent discovery of an arrest warrant." *Id.* at ¶23.

{¶25} Here, the facts before us indicate Deputy Winfield's initial encounter with Appellant was not a consensual encounter, but rather was an investigative stop. As indicated above, the truck at issue was legally parked and thus the initial stop was not a traffic stop. The record indicates that at least four law enforcement vehicles descended upon the residence where the truck at issue was parked. Further, Detective Winfield activated his lights when he pulled in behind the truck. Finally, Detective Winfield immediately approached the driver's side of the vehicle with his gun drawn after he initiated the stop. Thus, the interaction constituted an investigatory stop. As set forth above, an investigatory stop or detention must be supported by a reasonable, articulable suspicion of criminal activity.

{¶26} Contrary to Appellant's arguments below, and now on appeal, the record before us indicates that law enforcement had knowledge there was an active, outstanding warrant for Appellant's arrest for probation violations. Although we do not know the nature of the probation violations, it is clear from the testimony introduced by the State during the suppression hearing that three different law enforcement officers were informed prior to locating Appellant that there was an outstanding warrant for his arrest and the warrant was confirmed to be active by the probation department immediately prior to the investigative stop. Thus, the privacy concerns present in *Gardner* are not present here. As a result, we find *Gardner* is not applicable.

{¶27} Further, in *State v. Haynes*, 2018-Ohio-607, 106 N.E.3d 342, ¶3, an investigatory stop was upheld where an officer's random license plate check of a passing vehicle revealed that the registered owner of the vehicle had a warrant for her arrest, and

the driver of the vehicle matched the description of the registered owner. In reaching its

decision, the *Haynes* court noted as follows:

> It is beyond dispute that a police officer may detain a motorist when he
> has a reasonable, articulable suspicion that the motorist has committed *any*
> criminal offense, including a traffic offense, and no other independent
> reasonable and articulable suspicion is required. Citing *State v. Chase*,
> 2nd Dist. Montgomery No. 25323, 2013-Ohio-2347, ¶17.[2]

The *Haynes* court's reasoning then followed that the officer's knowledge of an active

arrest warrant provided him with reasonable suspicion to believe that the driver had

committed a criminal offense, which entitled him to "stop," "seize," or "detain" the driver

to pursue the warrant issue further. *Id.* at ¶10. This Court has also acknowledged with

approval a fact pattern involving an individual's initial stop while sitting in the driver's

seat of a vehicle, based solely upon an officer's recognition of the individual coupled

with an awareness of the fact there was a warrant for his arrest. See *State v. Maughmer*,

4th Dist. Ross No. 09CA3121, 2010-Ohio-4425, ¶2.

{¶28} Despite Appellant's argument that law enforcement did not know there was

an active warrant for his arrest prior to initiating an investigatory stop, there is evidence

in the record indicating otherwise. Although none of the officers that testified during the

suppression hearing included information about the known warrant in their written

reports, they each testified very specifically that they had prior knowledge of the warrant

and had confirmed the active nature of the warrant before encountering Appellant. In its

written entry denying the motion to suppress, the trial court found that "Detective John

---

[2] No traffic violation was observed in *Haynes*.

Winfield learned that Pike County Probation officers had arrest warrants for Defendant and Terry Titer" and that this knowledge was obtained prior to the stop. As explained above, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Whether law enforcement obtained knowledge of the warrant prior to or after the stop was a factual finding properly determined by the trial court, and we defer to this finding.

{¶29} We next consider whether Detective Winfield properly identified Appellant as the subject of the arrest warrant prior to approaching him and ordering him out of the truck. Appellant contends he was seized before his identity was known. He bases this argument, in part, on the fact that the written police reports contained no reference to Major Lewis' radio communication that Appellant and Terry Titer were in the truck as he drove past it while pulling in the driveway associated with the 2140 Valley Road address. He contends the fact that Detective Winfield asked him his name as he was getting him out of the truck further supports his argument that Winfield did not positively identify him until after he was stopped and seized.

{¶30} As set forth above, all three law enforcement officers testified that Major Lewis "marked" on the radio that Appellant and Titer were in the truck as he drove by, only seconds before Detective Winfield approached the truck. The record indicates that Major Lewis had personal knowledge of both Appellant and Titer such that he could recognize them while driving by. Further, although Detective Winfield did not personally know Appellant, he did have a prior history with Titer and visually noted he was sitting in the passenger seat as he approached the truck. Thus, based upon Major Lewis' radio communication as well his recognition of Titer as the passenger, Detective

Winfield ordered Appellant, who was sitting in the driver's seat, out of the truck. It further appears he simply confirmed Appellant's identity as he immediately began to pat him down for weapons, which he did for officer safety.

{¶31} Appellant argues Major Lewis' identification of him on the radio constituted hearsay because Lewis did not testify during the suppression hearing. However, " 'the Rules of Evidence do not apply to suppression hearings.' " *State v. Ulmer*, 4th Dist. Scioto No. 09CA3283, 2010-Ohio-695, ¶10; quoting *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶17; citing Evid.R. 101(C)(1) & 104(A); see also *State v. Norman*, 4th Dist. Ross Nos. 08CA3059 & 66, 2009-Ohio-5458. Therefore, " '[a]t a suppression hearing, the court may rely on * * * evidence, even though that evidence would not be admissible at trial.' " *Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999); quoting *United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Thus, this portion of Appellant's argument fails as a matter of law.

{¶32} Here, the record reveals that in arresting Appellant, Detective Winfield was collectively relying on a tip that was provided to BCI earlier in the day. BCI informed Detective Gannon it had received a tip indicating Appellant and Titer would be arriving at a Dollar General Store on Route 50 outside of Chillicothe and they were going to be making a drug transaction with an individual named "Black Mike." Detective Gannon knew Black Mike to be an individual he was familiar with named Mike Denney. Further, prior to the investigative stop, Detective Winfield had been informed this tip had been corroborated to the extent Detective Gannon observed a red Ford Ranger truck containing two individuals at the Dollar General Store, along with Mike Denney. Additionally,

Detective Winfield testified that he heard Major Lewis mark on the radio that both Appellant and Titer were in the truck as they approached the 2140 Valley Road Address. Moreover, Detective Winfield recognized Titer as the passenger as he approached the truck, which was parked, and thus he ordered the driver out of the vehicle. As no other individuals were in the truck, the driver was obviously Appellant.

{¶33} "An officer may derive his knowledge from an informant's tip." *State v. Kelley*, 4th Dist. Ross No. 10CA3182, 2011-Ohio-3545, ¶25; citing *State v. Walker*, 10th Dist. Franklin No. 97AP09-1219, 1998 WL 429121 (July 28, 1998). Further, as we noted in *Kelley*, "an officer may rely upon information collectively known to the law enforcement officers involved in the search or investigation." *Kelley* at ¶26; citing *State v. Cook*, 65 Ohio St.3d 516, 521, 605 N.E.2d 70 (1992). " 'An officer need not have knowledge of all of the facts necessary to justify [a search], as long as the law enforcement body as a whole possesses such facts and the detaining officer reasonably relies upon those who possess the facts.' " *Id.* As such, this Court has also observed that " '[a] radio broadcast may provide the impetus for an investigatory stop, even when the officer making the stop lacks all of the information justifying the stop.' " *Id.* As a result, the Supreme Court of Ohio has "described the relevant Fourth Amendment inquiry as 'whether the law-enforcement community as a whole complied with the Fourth Amendment; the entire system is required to possess facts justifying the stop or arrest, even though the arresting officer does not have those facts.' " *Id.* (citations omitted).

{¶34} In *Kelley*, we further explained as follows regarding the collective knowledge of law enforcement in the case of a common investigation:

"In the case of a common investigation, the knowledge of one officer is

the knowledge of all, and the collective knowledge of all the investigating

officers, and the available objective facts, are the criteria to be used in

assessing probable cause. *United States v. Stratton* (C.A.1972), 453

Fed.2d 36, 37, cert. denied, 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800.

See also*, State v. Gough* (1986), 35 Ohio App.3d 81, 82, 519 N.E.2d 842

(police may rely on collective knowledge in making arrest); *State v.*

*Roach*, (1982), 8 Ohio App.3d 42, 455 N.E.2d 1328 (officer intruding into

restroom stall did not have knowledge of defendant's conduct, but police

department as a whole had probable cause)." *Kelley* at ¶26; citing *State v.*

*Royster*, 5th Dist. Stark No. 1997CA00372, 1998 WL 351413, *3.

{¶35} Based upon the foregoing caselaw and viewed in light of the totality of the surrounding circumstances, we conclude Detective Winfield possessed reasonable suspicion, based upon sufficiently reliable information, that Appellant was seated in the driver's seat of the truck at issue and that Appellant had an outstanding arrest warrant that was active. Further, Detective Winfield had this information prior to initiating the investigatory stop. Thus, we conclude the trial court properly denied Appellant's motion to suppress. The trial court's reliance upon *Williams* was harmless as the trial court reached the correct decision, even if its reasoning was somewhat flawed.

{¶36} However, as set forth above, the judgment entry of sentence dated August 24, 2018, as well as the nunc pro tunc entry that was subsequently filed on September 18, 2018, both incorrectly state that Appellant pleaded guilty to the charges at issue, rather than no contest. It further appears from a review of the online docket that this error

remains uncorrected.  Thus, pursuant to App.R. 9(E), we instruct the trial court to issue another nunc pro tunc order to correct the clerical error in both the judgment entry of sentence and the nunc pro tunc entry already filed, and to reflect that Appellant pleaded no contest rather than guilty.

{¶37} Having found no merit in the sole assignment of error raised by Appellant, it is overruled.  Accordingly, the judgment of the trial court is affirmed with instructions.


**JUDGMENT AFFIRMED WITH INSTRUCTIONS.**

**<u>JUDGMENT ENTRY</u>**

It is ordered that the JUDGMENT BE AFFIRMED WITH INSTRUCTIONS and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Jason P. Smith, Presiding Judge


**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**